**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 21, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff–Appellee,

v.

BRYAN BERRES,

      Defendant–Appellant.

No. 14-7008

---

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:13-CR-00049-RAW-1)**

---

Carl Folsom, III, Assistant Federal Public Defender (Julia L. O'Connell, Federal Public Defender; and Robert Ridenour, Assistant Federal Public Defender with him on the briefs), Office of the Federal Public Defender, Muskogee, Oklahoma for the Defendant-Appellant.

Linda A. Epperley, Assistant United States Attorney (Mark F. Green, United States Attorney; and Kyle Evan Waters, Assistant United States Attorney with her on the brief), Muskogee, Oklahoma for the Plaintiff-Appellee.

---

Before **LUCERO**, **HOLMES**, and **PHILLIPS**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

---

Bryan Berres appeals following his conditional guilty plea to three counts of possession of an unregistered firearm in violation of 26 U.S.C. § 5861(d). He raises several challenges to the validity of those counts. First, he argues that his conviction for possessing an unregistered flash bang device violates his due process rights because it was impossible for him, as a transferee of the device, to register it. However, our circuit jurisprudence distinguishes between firearms that may not be registered at all because their possession is banned, and those firearms that may be registered by a maker or a transferor, even if not by a transferee. Compare United States v. Dalton, 960 F.2d 121 (10th Cir. 1992), with United States v. McCollom, 12 F.3d 968 (10th Cir. 1993). Because the flash bang at issue falls into the latter category, Berres' argument fails.

Berres also challenges two § 5861(d) counts that were based on unassembled destructive devices. We are unpersuaded by his argument that the implementing regulations for § 5861(d) require registration only for completed devices. And we reject his contention that these charges were multiplicitous because he possessed only a single combination of parts. The statute permits separate prosecution for each firearm possessed, and the definition of firearm includes "any combination of parts either designed or intended for use in converting any device into a destructive device . . . and from which a destructive device may be readily assembled." 26 U.S.C. § 5845(f)(3) (emphasis added). Because Berres was properly charged with possessing two combinations designed or intended to create two destructive devices, we conclude the charges were not multiplicitous.

Lastly, Berres appeals the denial of his motion to suppress statements he made to a law enforcement officer while in a hospital. We agree with the district court that suppression was inappropriate because Berres was not in custody at the time he made the statements. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**I**

On May 9, 2013, Berres walked into the AmeriGas Propane Company in Tahlequah, Oklahoma. As he entered the business, he placed a backpack near the front door. Berres first asked if he could use a phone to call his wife, then requested that employees call an ambulance to take him to the Veterans Administration ("VA") Hospital in Muskogee, Oklahoma. Suspecting that Berres was in need of psychiatric treatment, the employees called for an ambulance.

Medical personnel arrived within minutes. When asked if he had any weapons, Berres handed over a knife and stated that he had a .38 pistol in his bag. The medics on scene then called for assistance from the Tahlequah Police Department. An officer responding to the call questioned Berres about the pistol. Berres stated that the gun was not loaded and that he had a license to carry it. He also told the officer that his bag contained a flash bang device, 8'' leads, squibs, and electric matches. The AmeriGas facility was evacuated, and agents from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and the Oklahoma Highway Patrol Bomb Squad were called. Berres was transported by ambulance to the Muskogee VA Hospital.

ATF special agent Ashley Stephens contacted Matt Meredith, an agent with the

District 27 Drug and Violent Crime Task Force, and asked him to meet with Berres at the VA Hospital. Meredith arrived at the hospital with two other officers, all dressed in plain clothes. Berres was seated in a room, eating, when Meredith reached him. Meredith introduced himself and asked if Berres would be willing to talk to him about the contents of his bag. Berres was "more than willing" to talk with Meredith. He stated that the bag contained a flash bang device, a .38 pistol, about 50 feet of Class C squib, about 70 feet of red paper fuse, two pounds of black powder, and night vision goggles. Berres also stated that he was taking these items to a wooded area to "get the government out of his body."

Meredith's interview with Berres lasted approximately an hour, during which time Meredith repeatedly left the room to relay information to Stephens. Berres was seated in a chair near an open door throughout the interview, with Meredith seated on the far side of the room. Two other officers were positioned in the hallway outside the door for most of the interview. A doctor entered the room at the end of the interview and told Meredith that Berres was being placed on a 72-hour psychiatric hold. Hospital progress notes state that Berres was "voluntar[il]y here in the emergency department, but he is uncertain if he would want to stay in the hospital." A subsequent notation states that staff were awaiting an evaluation from "mental health," that police "plan[] emergency detention order," and that "the patient does not want to stay."

Following Meredith's interview, law enforcement safely opened Berres' backpack. It contained a flash bang device, two cans of black powder, six feet of cannon fuse, 36

electric matches, sixty feet of quick match fuse, a .38 pistol, nearly 300 rounds of .38 ammunition, and thirty rounds of .223 ammunition. Berres was charged with three counts of possession of an unregistered firearm. Count one relates to the flash bang device; counts two and three each charged possession of a combination of parts from which a destructive device may be readily assembled, specifically a black powder container, cannon fuse, and electric matches.

Berres filed a motion to dismiss, arguing that count one violated his due process rights because it was not legally possible for him to register the flash bang, that counts two and three failed to state an offense, and that counts two and three were multiplicitous. The district court denied the motion but stated that Berres could raise the multiplicity argument again after the government presented its case at trial. Berres also filed a motion to suppress the statements he made to Meredith, which the district court denied.

Berres then pled guilty to all three counts pursuant to a written plea agreement. He reserved the right to appeal the denials of his motion to dismiss and his motion to suppress. Berres was sentenced to sixty months' probation. He timely appealed.

**II**

**A**

Berres first contends that his conviction on count one violated his due process rights because it was legally impossible for him to register the flash bang device forming the basis of that charge. We review the constitutionality of a statute de novo. See United States v. Shavanaux, 647 F.3d 993, 996 (10th Cir. 2011).

Under § 5861(d), no person may "receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." For purposes of the statute, "firearm" refers to a specific list of devices, including sawed off shotguns, machineguns, and "destructive devices" such as grenades or flash bangs. § 5845. The "maker" or "transferor" of a firearm must register the firearm and pay a tax. See §§ 5812, 5822. Transferors must identify the transferee as part of the registration process. § 5812.

Berres argues that because he is not a maker or transferor of the flash bang, it was legally impossible for him to register the device. Although regulations implementing the statute require transferors to identify transferees, they do not allow an unregistered transferee to register. See 27 C.F.R. § 479.101(b) ("Each firearm transferred shall be registered to the transferee by the transferor in the manner prescribed by this part. No firearm may be registered by a person unlawfully in possession of the firearm except during an amnesty period established under section 207 of the Gun Control Act of 1968."). And a registration application must be denied "if the making or possession of the firearm would place the person making the firearm in violation of law." 26 U.S.C. § 5822.

In support of his due process argument, Berres relies heavily on United States v. Dalton, 960 F.2d 121 (10th Cir. 1992). In that case, we concluded that a defendant may not be convicted of possessing an unregistered machinegun under § 5861(d). Because "[a] separate criminal statute prohibits the possession of any machinegun" and "the

-6-

government will not permit the registration of machineguns," we concluded that "compliance with the registration requirements referred to in sections 5861(d) and (e) is impossible with this weapon." Dalton, 960 F.2d at 121. We also noted that "because the registration requirements of the National Firearms Act were passed pursuant to the taxing power, and because after the [ban on machinegun possession], the government will no longer register or tax machineguns," the government lacked "the constitutional legitimacy of registration as an aid to taxation." Id. at 124-25.[1]

Unlike the machineguns at issue in Dalton, however, the flash bang Berres was convicted of possessing can be registered by a transferor. Accordingly, his claim is controlled not by Dalton, but by United States v. McCollom, 12 F.3d 968 (10th Cir. 1993). In McCollom, we rejected a due process challenge to a § 5861(d) conviction for possession of two unregistered sawed-off shotguns. 12 F.3d at 970. The defendant argued "his due process rights were violated by his conviction for possessing unregistered weapons when he could not register them." Id. We concluded his analogy to Dalton was inapt: "The distinguishing feature between the short-barreled shotgun in this case and the machinegun in Dalton is that there is no statutory ban on the registration of short-barreled

---

[1] As the government notes, several circuits have disagreed with Dalton's reasoning. See United States v. Bournes, 339 F.3d 396, 399 (6th Cir. 2003) (explaining that the 4th, 5th, 7th, 8th, 9th, and 11th Circuits have rejected Dalton, with no circuit agreeing). These courts have concluded that an individual can comply with the statute by declining to possess a machinegun. Id. However, Dalton remains good law in this circuit and is thus binding on our panel. See Rezaq v. Nalley, 677 F.3d 1001, 1012 n.5 (10th Cir. 2012) (panel may not overrule another absent intervening Supreme Court or en banc authority).

shotguns." McCollom, 12 F.3d at 971 (quotation omitted). Even if the defendant himself could not have registered the firearms as a transferee, the firearm was not wholly unregisterable. We thus held that "[d]ifferent from Dalton, the registration of this weapon was not a legal impossibility." Id.; see also United States v. Eaton, 260 F.3d 1232, 1237 (10th Cir. 2001) ("Dalton involved a situation in which a particular statute criminalized possession of a machine gun, thereby making gun registration legally impossible. There is no similar statute criminalizing the possession of a destructive device such as a pipe bomb."). Many decisions from other circuits have made this same distinction. See, e.g., United States v. Ridlehuber, 11 F.3d 516, 526 (5th Cir. 1993) ("[E]ven if Dalton is correct as to the class of machineguns made illegal . . . , the Tenth Circuit's reasoning in Dalton does not encompass short-barreled shotguns, which can be possessed legally under federal law if registered.").

Because the flash bang device Berres was convicted of possessing in count one could have been registered, even if not by Berres himself, we must reject his due process argument.

**B**

Berres also claims that counts two and three fail to state an offense because there is no duty to register a destructive device until it is assembled. We generally review a district court's denial of a motion to dismiss a criminal indictment for abuse of discretion, but review any statutory interpretation issues involved in the ruling de novo. See United States v. Welch, 327 F.3d 1081, 1089-90 (10th Cir. 2003). We apply the following two-

-8-

part test in determining the sufficiency of an indictment:

> First, the indictment must contain the elements of the offense and sufficiently apprise the defendant of what he must be prepared to meet; second, it must be such as to show to what extent he may plead a former acquittal or conviction as a bar to further prosecution for the same cause.

United States v. Salazar, 720 F.2d 1482, 1486 (10th Cir. 1983) (quotation omitted).

Under 26 U.S.C. § 5845, a defendant may not possess an unregistered "destructive device" such as a "bomb," "grenade" or "similar device" or "any combination of parts either designed or intended for use in converting any device into a destructive device as defined . . . and from which a destructive device may be readily assembled." § 5845(f)(1), (3). Berres concedes that the combination of a "black powder container, canon [sic] fuse, and electric matches" identified in the indictment fits within this definition. But he contends that the charges are faulty because, under the statute's implementing regulations, a destructive device need not be registered until it is actually assembled.

Berres points to 27 C.F.R. § 479.24, which allows an individual to request a determination as to whether a device qualifies under § 5845(f). Such requests must include:

> a complete and accurate description of the device . . . and such photographs, diagrams, or drawings as may be necessary to enable the Director to make his determination. The Director may require the submission to him, of a sample of such device for examination and evaluation. If the submission of such device is impracticable, the person requesting the ruling shall so advise the Director and designate the place where the device will be available for examination and evaluation.

§ 479.24. Berres also relies on 27 C.F.R. § 479.103, which requires manufacturers of firearms, including destructive devices, to file a "Notice of Firearms Manufactured or Imported" for all firearms made in a single day "no later than the close of the next business day." Id. The notice must include "the date of manufacture, the type, model, length of barrel, overall length, caliber, gauge or size, serial numbers, and other marks of identification of the firearms he manufactures." Id. Berres contends that these regulations imply a duty to register that arises only when a destructive device has been fully assembled.

We do not read these regulations as limiting the duty to register to completely assembled destructive devices. Nothing in the text of § 479.24 would preclude an individual from requesting a determination as to a combination of parts from which a destructive device may be readily assembled. As to § 479.103, we acknowledge that one would typically envision the "manufacture" of a "firearm" to involve complete assembly. But the term "firearm" is defined by regulation, consistent with the statutory provisions, to include "any combination of parts either designed or intended for use in converting any device into a [bomb, grenade, or similar device] and from which a destructive device may be readily assembled." § 479.11; see 26 U.S.C. § 5845(f). With this definition in mind, § 479.103 necessarily includes the manufacture of a combination of parts from which a destructive device may be readily assembled, and thus cannot be limited to fully assembled firearms.

Moreover, construing the regulations as applying only to fully assembled firearms

would render nugatory the statutory language that prohibits possession of an unregistered combination of parts "from which a destructive device may be readily assembled." 26 U.S.C. § 5845(f). And as one of our sibling circuits has observed, such a construction would frustrate the Congressional scheme. See United States v. Shafer, 445 F.2d 579, 583 (7th Cir. 1971) ("The statute does not specify that the parts must be assembled before it applies. To place such a construction upon the language of the Act would contradict the flexibility expressly created by Section 5845(f) and would foster easy evasion to thwart the Congressional intent."); see also United States v. Klanecky, 393 F. App'x 409 (8th Cir. 2010) (unpublished) (per curiam) (upholding conviction for possession of unassembled grenade).

## C

In addition to arguing that counts two and three fail to state an offense, Berres contends that those charges are multiplicitous. We review such claims de novo. United States v. Jackson, 736 F.3d 953, 956 (10th Cir. 2013). The Double Jeopardy Clause bars "multiple punishments for the same offense based on the total punishment authorized by the legislature." Id. at 955. We "presume that where two statutory provisions proscribe the same offense, a legislature does not intend to impose two punishments for that offense." Rutledge v. United States, 517 U.S. 292, 297 (1996) (quotation omitted). However, a defendant "may be prosecuted for more than one crime based on the same conduct (1) if each crime requires proof of a fact that the other does not or (2) if Congress has clearly expressed its intent to impose cumulative punishment for the same conduct

-11-

under different statutory provisions." United States v. Morris, 247 F.3d 1080, 1083 (10th Cir. 2001) (quotation omitted). If the statutory language is sufficiently ambiguous, the rule of lenity requires us to limit the charges to a single unit of prosecution. Jackson, 736 F.3d at 956.

Berres argues that he possessed only a single combination of parts, which included both cans of black powder, and all of which were contained in a single backpack. The district court denied his motion to dismiss but noted that the question of whether a single course of conduct constitutes multiple offenses may not be clear from the charging documents alone. See United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 225 (1952). Accordingly, it held that Berres could renew his argument at the close of the government's case. Berres subsequently entered a conditional guilty plea, and thus the facts were never fleshed out through trial. Under these circumstances, our review is circumscribed.

"A plea of guilty and the ensuing conviction comprehend all of the factual and legal elements necessary to sustain a binding, final judgment of guilt and a lawful sentence." United States v. Broce, 488 U.S. 563, 569 (1989). However, as the Supreme Court held in Menna v. New York, 423 U.S. 61 (1975), certain double jeopardy claims may proceed even after a guilty plea because if "the State is precluded by the United States Constitution from haling a defendant into court on a charge, federal law requires that a conviction on that charge be set aside even if the conviction was entered pursuant to a counseled plea of guilty." Id. at 62. This does not mean that "a double jeopardy

-12-

claim may never be waived," but that "a plea of guilty to a charge does not waive a claim that—judged on its face—the charge is one which the State may not constitutionally prosecute." Id. at 62 n.2. Thus, a defendant advancing a double jeopardy claim following a guilty plea must "prove [his] claim by relying on th[e] indictment[] and the existing record . . . without contradicting th[e] indictment[]." Broce, 488 U.S. at 576.

Section 5861 prohibits any person from receiving or possessing "a firearm" and requires that "each firearm" be registered. Id. This language makes it sufficiently clear that "each firearm constitutes a separate unit for the purposes of criminal prosecution." United States v. Sanders, 441 F.2d 412, 414 (10th Cir. 1971) (quotation omitted). Accordingly, "one who possesses two firearms, neither of which is registered to him in the National Firearms Registration and Transfer Record, has twice violated the provisions of 26 U.S.C. § 5861(d) and he may be prosecuted for each violation." Id.

Applying the rule that possession of each unregistered firearm constitutes a separate offense is straightforward in cases like Sanders, in which the charges relate to guns. We face a more difficult task in applying this rule to multiple charges for "combination[s] of parts." § 5845(f)(3). In ordinary usage, one might refer to a bag of components from which a large number of destructive devices could be assembled as a single "combination of parts." Id. On the other hand, depending on the particular facts, a single container might be described as having several different combinations of parts from which multiple destructive devices could be assembled. Berres suggests that this ambiguity requires lenity. See Jackson, 736 F.3d at 956.

-13-

But this ambiguity disappears when the full text of § 5845(f)(3) is considered.  See Dolan v. U.S. Postal Service, 546 U.S. 481 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text . . . ."); see also Barber v. Thomas, 560 U.S. 474, 488 (2010) ("[T]he rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." (quotation and citation omitted)).  The statute does not refer simply to a "combination of parts," but to "any combination of parts either designed or intended for use in converting any device into a destructive device . . . and from which a destructive device may be readily assembled."  § 5845(f)(3) (emphasis added).  Based on this language, we hold that whether a group of components will support multiple charges depends on whether the components were "designed or intended" to be converted into multiple destructive devices.

The indictment in this case parallels the statutory language.  In count two, it alleges that Berres possessed "a metal GOEX black powder container, canon [sic] fuse, and electric matches" and that this combination of parts was "designed or intended for use in converting any device into a destructive device."  Count three alleges that Berres possessed a second "metal GOEX black powder container" along with "canon [sic] fuse, and electric matches" and that this second combination of parts was "designed or intended for use in converting any device into a destructive device."  Further, Berres acknowledged at his change of plea hearing that he possessed "components to assemble

-14-

two destructive devices." Based on this record, we conclude that Berres was permissibly charged with two separate counts under § 5861(d) for his possession of two combinations of parts designed or intended for use in constructing a destructive device.

**D**

In his final challenge, Berres appeals the district court's denial of his motion to suppress. In reviewing the denial of a motion to suppress, we take the facts found by the district court, unless clearly erroneous, and view the evidence in the light most favorable to the government. See United States v. Jones, 523 F.3d 1235, 1239 (10th Cir. 2008). The ultimate determination of whether Miranda v. Arizona, 384 U.S. 436 (1966), applies is reviewed de novo. Id. Miranda warnings are required when a person is "in custody." United States v. Bernard, 680 F.3d 1206, 1211 (10th Cir. 2012). "In determining whether a person is in custody in this sense [for Miranda purposes], the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." Howes v. Fields, 132 S. Ct. 1181, 1189 (2012) (quotations and alterations omitted).

Berres points to a number of factors that, he claims, weigh in favor of a finding that he was in custody. He was apparently not made aware that he was free to leave. See Oregon v. Mathiason, 429 U.S. 492, 495 (1977). The questioning related to a potential crime committed by him. See Berkemer v. McCarty, 468 U.S. 420, 437 (1984). And, he argues, the questioning took place in a "police[-]dominated" atmosphere. Id. at 439. The district court acknowledged that some of the factors weighed in favor of a finding that

-15-

Berres was in custody, but the totality of the circumstances did not warrant such a finding. We agree.

Importantly, Berres was at the hospital on his own request. See Fields, 132 S. Ct. at 1189 ("Relevant factors include the location of the questioning . . . ."); see generally United States v. Robertson, 19 F.3d 1318, 1320-21 (10th Cir. 1994) (concluding a hospital interrogation was not custodial). He was not told he was in custody, nor was he physically restrained in any way. See id. (considering presence of restraints). Berres appeared calm, was completely willing to discuss the contents of his bag, and never sought to end the interview. Meredith was not aggressive or confrontational during his questioning, which lasted about an hour largely because Meredith repeatedly left the room to relay information to agents at the propane facility. See United States v. Lamy, 521 F.3d 1257, 1263-64 (10th Cir. 2008) (an hour-long interrogation that was not "unusually confrontational" did not qualify as custodial).

Nor can we accept Berres' assertion that the atmosphere in the hospital room was police-dominated. Although three officers initially introduced themselves to Berres, only Meredith was in the room for the vast majority of the interview. See Jones, 523 F.3d at 1242 ("Jones did encounter multiple agents, but she was not confronted by them simultaneously or aggressively . . . [and only one agent spoke] with her throughout the encounter."). All three officers were in plain clothes, and none had a weapon displayed. See id. ("agents were in plain clothes, their guns concealed"). Meredith came and went from the room, as did hospital staff on at least one occasion. And Berres was seated

nearer to the room's open door than was Meredith.  See Fields, 132 S. Ct. at 1190 (noting that a reasonable belief of restricted freedom of movement is a necessary condition for Miranda custody).

Berres relies heavily on a medical record that indicates law enforcement "plans emergency detention order," and that Berres "does not want to stay."  However, the same record states that Berres was "voluntar[il]y here in the emergency department, but he is uncertain if he would want to stay in the hospital."  It is unclear when, in relation to the interview, Berres indicated that he did not want to stay or to whom.  Meredith testified unequivocally, however, that hospital staff rather than police imposed a psychiatric hold after he completed his questioning.  Taking the evidence in the light most favorable to the government, we cannot say that the district court clearly erred in finding Berres was not detained at the time of the interview.  See Jones, 523 F.3d at 1239.

Finally, Berres argues that officers improperly took advantage of his troubled mental state.  See Colorado v. Connelly, 479 U.S. 157, 164 (1986) (noting that "courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus").  However, the Court has made clear that "[t]he sole concern of the Fifth Amendment, on which Miranda was based, is governmental coercion."  Id. at 170.  Absent evidence that law enforcement coerced statements from Berres, and coupled with our conclusion that he was not in custody for Miranda purposes, his mental state did not require suppression.

## III

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.